[No. B028866. Second Dist., Div. Four. Dec. 13, 1990.]

UNION OIL COMPANY OF CALIFORNIA, Plaintiff, Cross-defendant and Appellant, v.
PATRICK M. O'RILEY, Defendant, Cross-complainant and Respondent.

## COUNSEL

Besser & Chapin, Robert S. Besser and Christopher Chapin for Plaintiff, Cross-defendant and Appellant.

Neil E. Campbell, Jr., for Defendant, Cross-complainant and Respondent.

## OPINION

**GOERTZEN, J.**—On October 24, 1989, we dismissed this appeal, finding that the federal courts exercise exclusive jurisdiction over cases based upon violations of the Petroleum Marketing Practices Act (PMPA), 15 United States Code section 2801 et seq. Defendant/Cross-complainant/respondent Patrick M. O'Riley successfully petitioned the United States Supreme Court for writ of certiorari. The United States Supreme Court vacated our earlier judgment and remanded the cause to us for further consideration in light of *Tafflin* v. *Levitt* (1990) 493 U.S. 455 [107 L.Ed.2d 887, 110 S.Ct. 792]. Upon reconsideration, we conclude that our earlier opinion, relying primarily on *Rustom* v. *Atlantic Richfield Co.* (D.C.Cal. 1985) 618 F.Supp. 210, was in error and that the state courts do enjoy concurrent jurisdiction with the federal courts over cases based upon the PMPA. We first address our reasons for reaching this conclusion, and then the merits of the underlying appeal.

### DISCUSSION

In *Tafflin* v. *Levitt, supra,* 493 U.S. 455, the United States Supreme Court addressed the issue of whether state courts have concurrent jurisdiction with federal courts over suits brought pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO).

The court began its discussion with a reminder that state courts have inherent authority and are presumptively competent to adjudicate claims arising under laws of the United States, and that exclusive jurisdiction must be expressed or implied. (493 U.S. at p. __ [107 L.Ed.2d at p. 894].) "This deeply rooted presumption in favor of concurrent state court jurisdiction is, of course, rebutted if Congress affirmatively ousts the state courts of juris-

diction over a particular federal claim." (*Ibid.*) In addition to rebuttal by explicit congressional action, the presumption may by rebutted by unmistakable implication from legislative history, or clear incompatibility between state court jurisdiction and federal interests. (*Ibid.*)

The court found that there was no explicit congressional action establishing exclusive federal jurisdiction over RICO claims. (493 U.S. at p. __ [107 L.Ed.2d at p. 893].) As to the legislative history, the court held that there was no evidence that Congress even considered the question of concurrent jurisdiction, defining the test as "whether Congress in its deliberations may be said to have affirmatively or unmistakably intended jurisdiction to be exclusively federal." (*Id.*, at p. __ [107 L.Ed.2d at p. 896].) As to the concern about incompatibility with federal interests, the court noted the three factors indicating clear incompatibility (desirability of uniform interpretation, the expertise of federal judges in the federal law, and the assumed greater hospitality of federal courts to peculiarly federal claims) were not at issue in *Tafflin*. The court found that federal courts would retain full authority and responsibility for interpretation and application of federal criminal laws as they would not be bound by state court interpretations of federal offenses; state court judgments misinterpreting federal criminal law would be subject to direct review by the Supreme Court; and, in any event, any inconsistency arising from state court interpretations would be no more than that arising from the "multi-membered, multitiered federal judicial system." Moreover, the court concluded, it had full faith in the ability of state courts to handle the complexities of RICO, particularly since many RICO cases involved asserted violations of state laws. (*Id.*, at pp. __ [107 L.Ed.2d at pp. 897-898].)

The *Tafflin* plaintiffs had argued that the RICO statute was incompatible because it required conformance with extended venue and service-of-process provisions that are applicable only in federal courts. The court rejected this assertion, concluding that it had previously found concurrent jurisdiction in such situations and, standing alone, these procedural requirements did not indicate clear incompatibility of federal interests. (493 U.S. at p. __ [107 L.Ed.2d at p. 899.)

We are here concerned if the analysis of *Tafflin* compels us to reverse our earlier holding that the federal courts exercise exclusive jurisdiction over matters arising pursuant to the PMPA. As noted, we find that *Tafflin* does compel that reversal.

■ Plaintiff/cross-defendant/appellant Union Oil Company of California (Union Oil) concedes that there is no explicit grant of exclusive federal

court jurisdiction in the PMPA.[1] Union Oil argues, however, that, unlike Tafflin, the legislative history of PMPA does offer clear evidence that the Congress intended the federal courts to exercise exclusive jurisdiction. It argues that the nature and purpose of the PMPA establish the clear incompatibility between state court jurisdiction and federal interests.

To support these assertions, Union Oil points to comments made by congressional representatives, regarding the PMPA requirement that the franchisor prove to an "impartial arbiter, a Federal court judge" that termination or nonrenewal of a franchise was proper, and that the legislation provides for "enforcement by private civil action in U.S. District Court" (95th Cong. 1st Sess., Cong. Rec.—House, vol. 123, pt. 9, pp. 10384, 10387). Union Oil quotes several passages from the Congressional Record where the need for uniformity of rules throughout the states is underscored as a reason for passage of the PMPA. It notes that the PMPA explicitly preempts all conflicting state laws and points out that the PMPA specifically incorporates the Federal Rules governing not venue and service of process, like *Tafflin*, but the manner in which relief may be fashioned and utilizes the standards set forth in rule 65 of the Federal Rules of Civil Procedure for issuance of preliminary and temporary equitable relief.

This is precisely the analysis done by Judge Tashima in *Rustom v. Atlantic Richfield, supra,* 618 F.Supp. 210, the decision upon which we previously relied. In vacating our earlier judgment, it appears the United States Supreme Court is not of the same mind. *Tafflin's* reasoning makes clear that the presumption in favor of concurrent jurisdiction is not to be lightly discarded. Random comments made during presentation of the legislation which do not directly discuss whether the legislation "ousts the state courts of jurisdiction" are insufficient. (*Tafflin v. Levitt, supra,* 493 U.S. at p. __ [107 L.Ed.2d at pp. 894, 895-896].) Desire for uniformity of enforcement does not necessitate a finding that Congress meant only federal courts to rule on PMPA matters. (*Id.,* at p. __ [107 L.Ed.2d at p. 898].) Conformance with federal rules of procedure does not create a "clear incompatibility" with federal interests. (*Id.,* at p. __ [107 L.Ed.2d at p. 899].) Consequently, we find that state courts have concurrent jurisdiction with federal courts over claims made pursuant to the PMPA.[2]

---

[1] In pertinent part, section 2805 (a), of the PMPA provides: "If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchisee may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business . . . ."

[2] We are aware that this conclusion is at odds with the holding of *Niakan v. Samaan* (1988) 199 Cal.App.3d 716 [245 Cal.Rptr. 24]. We note, however, that *Niakan* relied solely on *Rus-*

## The Underlying Appeal

### Introduction

Union Oil sued respondent Patrick M. O'Riley (respondent) for sums due for gasoline and diesel delivered to respondent's station and resold by him. Respondent cross-complained, asserting Union Oil violated the notice requirements of the PMPA, breached their contract, and made promises it did not intend to keep. After a jury trial, the jury returned a verdict in favor of Union Oil on its complaint in the amount of $15,869.68, and in favor of Union on the contract and fraud claims of respondent. The jury found for respondent on his PMPA claim and awarded him $162,000. The court awarded respondent $40,000 in attorney fees, $40,500 in punitive damages, and $2,625 expert witness fees. Union Oil appeals.

### Facts

As there is some dispute about the sufficiency of the evidence presented, we set forth the facts as related in pertinent testimony.

Respondent's Testimony:

On June 22, 1981, respondent entered into a franchise lease with Union Oil, wherein he agreed to operate the Union Oil station located on the corner of Figueroa Street and Pacific Coast Highway in the city of Wilmington.

There were 3 tanks at the station: one 10,000-gallon leaded premium tank, one 10,000-gallon unleaded regular tank, and one 5,000-gallon diesel tank. To arrange delivery of needed fuel, respondent would call the Union Oil terminal 48 hours prior to the desired delivery date and order the necessary amounts. He would then prepare the payment for the previous load and place it in the lockbox. Only Union Oil fuel delivery personnel had keys to the lockbox. The normal delivery procedure was as follows: the Union Oil fuel delivery truck driver would drive to the back of the station, retrieve payment for the previous load from the lockbox, then deliver the new load. Prior to December 6, 1981, Union Oil never delivered a load of gasoline which respondent had not ordered 48 hours before. Neither was there ever a time when respondent had to pay for a current load of gasoline before it would be delivered. As the Union Oil representatives explained to

tom v. *Atlantic Richfield, supra,* 618 F.Supp. 210 and was decided well before *Tafflin* v. *Levitt, supra,* 493 U.S. 455.

respondent, the only requirement for delivery of a fresh load of fuel was payment for the previous load before delivery of the fresh load.

When respondent began his franchise, the station was operated as a full-service station. In addition to the fuel, the station had two service bays with a fully qualified mechanic on duty and offered tires, batteries and accessories for sale. Andre F. Van der Valk, the Union Oil area manager in charge of the service stations in respondent's area, met with him often and suggested that the station become a self-serve station. Respondent, however, had no intention of becoming self-service and told Mr. Van der Valk so. Though Mr. Van der Valk offered incentives, respondent was reluctant to convert the station because he would be required to close the service bays and reduce his retail sales. Mr. Van der Valk offered to pay respondent the value of the station retail inventory. In exchange he wanted respondent to convert the station within 30 days, install 14 automated pumps, increase the diesel capacity to 10,000 gallons, and reduce the lease costs by 75 percent. Respondent was still hesitant.

Thereafter, in June 1981, respondent placed an order for delivery of gasoline, and it was not delivered. When he inquired as to the reason, he was informed that a credit hold had been placed on his order and that he would have to speak to Mr. Van der Valk. Respondent was surprised because he had not written any bad checks and had never failed to pay for a previous load. A couple of days before, respondent had spoken to Mr. Van der Valk, who again had broached the self-serve idea. When respondent asked if he could close the station between the hours of midnight and 6 a.m., Van der Valk commented, "Well, if you're not gonna [sic] consider going self-serve, why should I consider do [sic] anything to you." Respondent was unable to contact Mr. Van der Valk about the credit hold and finally spoke to Bill Thomas, the Union Oil retail representative. Mr. Thomas assured him there was no "hold" on his fuel load. Mr. Thomas attempted to reach Mr. Van der Valk but later informed respondent that Mr. Van der Valk was on vacation, and the terminal would not release respondent's order without Mr. Van der Valk's authorization. Mr. Thomas unsuccessfully attempted to have another manager lift the "hold" but was told that only Mr. Van der Valk could do so. By that time respondent had run out of fuel and had been forced to close the station. When Mr. Van der Valk returned, he lifted the hold and apologized, explaining that it had been a mistake.

Forty-eight hours before the 4th of July, respondent placed an order for gas because he was going to be out of town for the holiday and wanted the gas delivered before he left. He prepared the payment for the previous load, but the load was not delivered during that three-day holiday weekend.

When later seeking an explanation from Mr. Van der Valk, he was told the load had been mistakenly delivered to another station, which had not ordered gas. Respondent found this explanation to be unbelievable because he knew a load would not be delivered without payment in the lockbox for a previous load. Just prior to the 4th of July, respondent had had another discussion with Mr. Van der Valk, wherein Mr. Van der Valk had again recommended that respondent's station become self-serve. When respondent again declined, Mr. Van der Valk was unhappy. Also, Mr. Van der Valk had been upset earlier because respondent had purchased a tire changer from a manufacturer other than Union Oil. This purchase was permissible under respondent's contract.

Shortly thereafter, respondent was informed that he might require back surgery. Consequently, he began to rethink his position on converting to self-serve. In September 1981, respondent agreed to convert the station to self-serve. Mr. Van der Valk told him that when he stopped servicing cars and selling tires and other accessories, his rent would be reduced by $500 per month. Van der Valk said that within 30 days Union Oil would install all automated pumps, increase the fuel capacity, install a freeway sign and other self-serve signs around the stations. He also said that Union Oil would give respondent credit for or purchase his inventory. The two men shook hands on the deal.

Thereafter, respondent ceased selling tires and other accessories and closed his mechanical bays. Union Oil lowered his rent but did nothing else. Though respondent inquired on a daily basis about the work Union Oil had agreed to do, Union Oil never fulfilled its promises. Respondent was very concerned, especially about installation of the automated pumps since he had to continue hiring employees to monitor the amount of gas the customers were pumping. Consequently, respondent could not lower his prices. When Mr. Van der Valk told respondent to lower his prices if he wanted the other work done, he complied.

By November 1981, respondent concluded that Union Oil was not going to live up to its end of the bargain. He had a heated discussion with Mr. Van der Valk, informed him that he would place his franchise up for sale, and repeated that he would seek legal advice. Mr. Van der Valk called respondent a "troublemaker" and warned that he could find any excuse to terminate respondent's lease. Shortly thereafter, Mr. Thomas told respondent that Mr. Van der Valk was going to terminate his lease because respondent was causing too many problems.

From November 30 to December 1, 1981, and from December 10 to December 15, 1981, respondent was hospitalized. Before entering the

hospital on November 30, respondent had ordered a load of gasoline, which was delivered but for which respondent had not paid. While in the hospital from December 10 to 15, he received several calls from Union Oil demanding payment for a load that Union Oil said had been delivered between the 1st and 6th of December. Respondent asked who ordered the gas and why it was delivered without payment for the previous load. Union Oil responded that the delivery was related to a tank test it performed. Union Oil claimed respondent owed between $24,000 and $34,000. No one from Union Oil had given respondent notice about performing any tank test.

In the meantime, the station was running low on gas; therefore, respondent attempted to place an order for diesel fuel. Union Oil refused to deliver until he paid for the gas which had been delivered.

Respondent left the hospital on December 15 and stayed in bed until December 20. On December 20, his wife brought him some mail, including a notice of default under the station lease which requested a $1,648.09 payment due on December 1; a second notice of default which requested a $10,609.10 payment due on December 6; and a third notice of default which stated his lease would be terminated by December 21, 1981, and requested a $24,095.42 payment. The third notice was dated December 16, 1981. None of these notices was personally delivered to him by Union nor sent via certified mail. All of the notices had been sent to the service station. Respondent immediately called Mr. Van der Valk, who informed him that Union Oil was going to take the station the next day at 1 p.m.

Before December 20, respondent claims he had no idea Union Oil wanted about $25,000 from him. On December 21, respondent went to see his attorney. Respondent telephoned Mr. Van der Valk from his attorney's office, asked for an explanation, and warned that if Union Oil persisted a suit would be filed. Mr. Van der Valk reiterated that the station would be seized.

Testimony of Andre F. Van der Valk:

At the times relevant to this appeal, Mr. Van der Valk was the Union Oil area manager in charge of the service stations in the geographic area that included respondent's station.

Mr. Van der Valk did not place a credit hold on respondent in June 1981, or at any other time, and never interfered with a gas delivery to respondent's station.

Respondent arranged to meet with him and initiated discussions about the station conversion to self-serve. Mr. Van der Valk explained to

respondent that he did not have the authority to authorize complete conversion of a station to self-serve, and that normally a test period of six to eight months was necessary. Except for this one meeting, respondent and Mr. Van der Valk had no further discussions about a self-serve conversion until respondent contacted Mr. Thomas and indicated he had converted his station, and asked what Union Oil was going to do to assist him. This action took Mr. Van der Valk by surprise. After talking with Mr. Thomas, and seeking the necessary authorization, Mr. Van der Valk agreed to reduce respondent's rent by 75 percent and to provide him with signs. The rent was reduced and the signs were provided. At no time did Mr. Van der Valk attempt to force respondent to convert the station to self-serve. He made no false promises to him and did not interfere with his ability to run his business.

The delivery procedure was as described by respondent, that is, the delivery truck would pick up payment for the previous load from the lockbox before delivering the current load of gasoline.

Union Oil delivery receipt records indicate that on December 1, 1981, a load of approximately 8,700 gallons was delivered at 4:30 a.m. to respondent's station; that on December 6, 1981, approximately 8,600 gallons of gasoline was delivered at 10:25 p.m.; that earlier that day approximately 9,600 gallons had been delivered at 1:10 p.m.; and that on December 7, approximately 2,061 gallons were delivered in the morning. Each delivery consisted of only unleaded and super gasoline. The loads delivered on the 6th and 7th were delivered because Union Oil was conducting routine testing of the tanks and lines for any leaks or holes. Respondent's station was the last to be tested in the area.[3] When Union Oil performs a tank test the "lock-box" payment system is not utilized because the primary consideration is performance of the test. Normally, the station dealer and the credit department arrange for the tank test. As Mr. Van Der Valk was on vacation when the tank test was performed at respondent's station, he was unaware whether such an arrangement had occurred between the credit department and respondent before the tank test was done. However, in the case of respondent's station, it was a mistake to deliver the load without there being payment in the lockbox for the previous delivery. A subsequent letter received from Union Oil's credit supervisor in Illinois requested an explanation of why the test load was delivered without prior payment for the previous load. It appears that the Los Angeles gas terminal had misunderstood the verbal credit release from Illinois and had stamped the route slips "okay to deliver" before sending the dispatcher.

---

[3] The owner of the tank testing company testified that the tests on the gasoline tanks were performed on December 7, 1981, and the tanks were found to have leaks.

Mr. Van der Valk had authority to give notice of termination of station contracts. He is aware of the notice requirements of the PMPA, and when giving these notices he attempts to comply. On December 16, 1981, Mr. Van der Valk signed the default notice, requesting payment of almost $24,000 from respondent. The sole reason for the termination of respondent's contract was the amount Union Oil believed he owed for the delivered gasoline. The notice was served at the station, but Mr. Van der Valk did not know whether it was personally served on respondent. The receipt was not signed by respondent. The notice was not posted by certified mail.

Mr. Van der Valk was aware that respondent was experiencing economic difficulties at the station. Mr. Van der Valk did not discuss the situation with respondent. He went to the station on December 21st and collected the keys to the station from the manager. Mr. Van der Valk did not know that respondent had been in the hospital and did not recall respondent ever telephoning him to ask for an explanation.

Testimony of William Thomas:

During the times pertinent to this appeal, Mr. Thomas was a retail representative for Unocal Corporation. He was assigned the area which included respondent's service station. A retail representative functions as a landlord for Union Oil and normally makes calls on area stations every two weeks.

Respondent was the first to broach the subject of his station converting to self-serve. Mr. Thomas attended the meeting which occurred between respondent and Mr. Van der Valk to discuss the possibility of respondent's station becoming self-serve. He recalled that it was decided that respondent's station would be tested, a rent waiver would be issued, and if the test went well, Union Oil would offer a self-serve lease. Mr. Thomas had no advance notice that respondent was going to convert to self-serve and was surprised when he learned respondent had done so.

In the first part of December 1981, Mr. Thomas became aware that a tank test was to be performed at respondent's station. He called respondent and informed him that Union Oil would have to fill the tanks with gasoline. Respondent was concerned that he would have to pay for all the gasoline at that time, but Mr. Thomas assured him that he could pay for the gasoline as he sold it. After the tank test was completed, Mr. Thomas spoke to respondent and instructed him to call once he had sold enough gasoline to pay for a load, and Mr. Thomas would pick up the payment and record it accordingly. Mr. Thomas never received such a call from respondent, and respondent never offered to pay for any of the "test" gasoline.

Mr. Thomas prepared the December 16, 1981, default notice. He personally delivered it to respondent's service station on the 16th. Respondent was not at the station on that day, so he delivered the default to a Mr. Nelson, an employee at the station.

PROCEDURAL HISTORY

On September 13, 1982, Union Oil filed a complaint against respondent, alleging he owed it $23,466.41 with interest. Respondent cross-complained against Union Oil, alleging that Union Oil violated the provision of the federal PMPA when it terminated his franchise, that Union Oil breached certain of its contractual obligations to respondent, and Union Oil made promises to respondent it did not intend to keep.

After a jury trial, the jury returned a special verdict in favor of Union Oil on its complaint in the amount of $15,869.68;[4] against respondent on his causes of action for breach of contract and fraud; and in favor of respondent on his PMPA claims.

The court awarded respondent attorney fees in the amount of $40,000, punitive damages in the amount of $40,500,[5] and expert witness fees in the amount of $2,625.

---

[4] In pertinent part, the special verdict provided: "Did Union Oil give Patrick O'Riley 90 days' notice of termination? [¶] ANSWER: No . . . . [¶] Did Union Oil personally deliver notice of his franchise to Patrick O'Riley? [¶] ANSWER: No . . . . [¶] Is Union Oil excused from personally delivering the notice of termination to Patrick O'Riley because he was not prejudiced by lack of personal delivery? [¶] ANSWER: No . . . . [¶] Did Union Oil base its intention to terminate Patrick O'Riley's franchise on a reason for termination permitted by the Petroleum Marketing Practices Act? [¶] ANSWER: Yes . . . . [¶] Did Union Oil adequately set forth in the notice of termination its reasons for termination of Patrick O'Riley's franchise? [¶] ANSWER: Yes . . . . [¶] Did Union Oil deliberately create Patrick O'Riley's indebtedness in order to terminate his franchise? [¶] ANSWER: Yes . . . . [¶] Did the violation of the Petroleum Marketing Practices Act by Union Oil cause damage to Patrick O'Riley? [¶] ANSWER: Yes . . . . [¶] What is the total amount of damage suffered by Patrick O'Riley as a result of the violation of the Petroleum Marketing Practices Act? [¶] ANSWER: $162,000."

[5] Pursuant to the PMPA section 2805, (d)(2), the court and not the jury makes the award of punitive damages.

After reciting the jury's findings, the court's minute order offers the following rationale for the award of punitive damages: "This finding amounts to a determination by the jury that Union Oil acted in willful disregard of the requirements of Section 2802 and 2803 of the Act, and the rights of the franchisee, O'Riley, thereunder. [¶] The Court finds that defendant has net worth in the millions. That 24% of the damages assessed by the jury would adequately deter defendant from similar conduct in the future and would not be out of proportion to defendant's wealth. That plaintiff is entitled to reasonable attorneys fees; that plaintiff's requested attorneys fees of $53,800 was reasonable and necessary and that $40,000.00 of said sum

On May 27, 1987, judgment was entered.

On June 10, 1987, Union Oil moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. It asserted that the court was without subject matter jurisdiction and that the evidence was insufficient to support the jury's verdict. The motions were denied and a timely notice of appeal was filed.

## DISCUSSION

On appeal, Union Oil reiterates the contentions raised below. Having already addressed the subject matter jurisdiction argument, we now discuss Union Oil's other assertions that substantial evidence is lacking to support either the verdict on the PMPA claims or the punitive damages award. Both contentions are without merit.

*The PMPA Claim.* ■ "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) With this rule in mind, we look to the issues before us.

1. Creation of indebtedness. ■ By special verdict the jury found that respondent did owe Union Oil $15,869.68 for the gas which had been delivered to effectuate the tank tests and further found that Union Oil had deliberately created this indebtedness and used it as the basis for its decision to terminate the franchise. Union Oil asserts that there is no evidence to support this finding.

Union Oil argues that respondent had two choices once the gas was delivered. He could either refuse to accept the unordered gasoline or sell the gas to the public. Having sold the gasoline, respondent thereby accepted it. Within the meaning of California Commercial Code section 2606,[6] respondent thus chose to become indebted to it, according to Union Oil.

represents fees incurred in connection with Count III which the jury found for plaintiff and against defendant. That $2625.00 was incurred by plaintiff for expert witness fees and said sum is fair and reasonable. That plaintiff is entitled to an award of attorneys fees and costs pursuant to P.M.P.A. Act [*sic*]."

[6] In pertinent part, California Commercial Code section 2606 provides: "(1) Acceptance of goods occurs when the buyer . . . [¶] (c) Does any act inconsistent with the seller's ownership."

No one questions that respondent owed Union Oil for the gasoline, and the jury so found. The heart of Union Oil's argument is its denial that it deliberately created the indebtedness so it could have a basis for terminating respondent's franchise agreement. The problem with this argument is that Union Oil is asking us to reweigh the evidence. That, simply, is not our role. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925].) To have reached this conclusion, the jury perforce believed the testimony of respondent regarding the various disagreeable incidents which had occurred between respondent and Union Oil. On the basis of the evidence, summarized, *ante*, the jury concluded that Union Oil wanted to terminate respondent's franchise because he was a "troublemaker." According to respondent's testimony, he had had several unpleasant discussions with Mr. Van der Valk and, at one point, was warned by Mr. Thomas that Mr. Van der Valk was going to terminate his lease. The fact that Union Oil arranged for the testing of the tanks and the related delivery of the unordered gasoline when respondent was hospitalized was accepted by the jury as further evidence that Union Oil was not treating respondent O'Riley in an above board manner. We cannot say that the jury erred in coming to the conclusion that Union Oil "deliberately created" this indebtedness. Substantial evidence exists to support this finding.

2. Compliance with the PMPA notice requirements. In its special verdict the jury found that Union Oil had not given respondent 90 days' notice, had not personally delivered notice to respondent and was not excused from personal delivery of the notice to respondent. The jury did find Union Oil had based its intention to terminate respondent's franchise on a reason permitted by the PMPA; and adequately had set forth its reasons for termination in the notice. ■ Union Oil asserts that there is no substantial evidence that it failed to comply with the notice requirements of the PMPA and argues that, in fact, it substantially complied with these requirements.[7]

In so urging, Union Oil focuses on the adequacy of the statement of reasons included in the notice. No one argues that the statement of reasons

[7]In pertinent part, section 2804 of the PMPA provides: "(a) Prior to termination of any franchise . . . , the franchisor shall furnish notification of such termination . . . to the franchisee who is a party to such franchise . . . . [¶] (1) in the manner described in subsection (c) of this section; and [¶] (2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect. [¶] (b)(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination . . . takes effect, . . . [¶] (A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing such notification is reasonably practicable; . . . [¶] (c) Notification under this section—[¶] (1) shall be in writing; [¶] (2) shall be posted by certified mail or personally delivered to the franchisee; and [¶] (3) shall contain—[¶] (A) a statement of intention to terminate the franchise . . . together with the reasons therefor; [¶] (B) the date on which such termination . . . takes effect; and [¶] (C) the summary statement."

was inadequate; in fact, the jury specifically found that the notice contained an adequate explanation of Union Oil's reasons for termination. The jury found Union Oil violated the PMPA when it gave respondent, at the most, five days' notice of its intention to terminate the franchise and, without excuse, failed to personally serve respondent with the notice. We need not reiterate the uncontradicted evidence, summarized, *ante*, that clearly supports these findings.

In its reply brief, Union Oil asserts that the shortened notice of the instant case was reasonable under the circumstances and cites cases which hold that a "reasonable" standard applies. Union Oil admits that the trier of fact was not asked to determine whether five days' notice, and one day actual notice, was reasonable under the circumstances and blames this on a "drafting error." Union Oil, in effect, asks us to determine that the shortened notice was reasonable. We decline to do so because this is purely a question of fact. Moreover, Union Oil offers no explanation of how the "drafting error" occurred nor does it argue that the "drafting error" is grounds for reversal. In any event, as the jury found that Union Oil was not excused from personally delivering the notice of termination to respondent, a permitted inference is that had it been asked whether five days' notice was reasonable, the jury would have responded negatively.

*The Punitive Damage Award.* ■ Union Oil objects to the $40,500 punitive damages award, asserting that there is no substantial evidence to support the jury's finding that it deliberately created the indebtedness upon which it based its termination of respondent's franchise or that it willfully disregarded the requirements of the PMPA; consequently, the court's reliance on these findings is reversible error.

As we have concluded above that substantial evidence does exist to support the jury's finding regarding creation of the indebtedness, we need not repeat the exercise here. As to Union Oil's assertion that substantial evidence is lacking to support a finding that it willfully disregarded the requirements of the PMPA, it too is unavailing. Union Oil ignored the 90-day notice requirement. Its notice includes preprinted language, stating that Union Oil views as "unreasonable" the giving of 90 days notice whenever a franchisee is indebted to it. This language is evidence that Union Oil willfully ignored the PMPA's requirements whenever a franchisee owed it money. In addition, there was evidence that Union Oil representatives repeatedly threatened respondent with termination of his franchise because of unhappiness with his complaints. Respondent testified that Mr. Van der Valk threatened to terminate his franchise based on "any excuse." Mr. Thomas told respondent that Mr. Van der Valk was going to terminate the franchise because respondent was "causing too many problems." Thus, the court and

the jury found that the termination of respondent's franchise was in retaliation for respondent's complaints. This type of retaliatory termination is exactly the sort of conduct which Congress enacted the PMPA to prevent. (*Gilderhus* v. *Amoco Oil Co.* (D.C.Minn. 1979) 470 F.Supp. 1302, 1305.)

### DISPOSITION

The judgment is affirmed.

Woods (A. M.), P. J., and George, J., concurred.

Appellant's petition for review by teh Supreme Court was denied March 13, 1991.