**Eugene F. HANNON, et al., Plaintiffs**

**v.**

**EXXON COMPANY, U.S.A., Defendant**

**No. Civ. AMD 98–1822.**

United States District Court,
D. Maryland.

May 10, 1999.

Harry C. Storm, James L. Parsons, Jr., Abrams, West & Storm, P.C., Bethesda, MD, for plaintiffs.

Benjamin Sorrells Boyd, Piper & Marbury, LLP, Washington, DC, Kelly H. Scoffield, Exxon Company, U.S.A., Houston, TX, for defendant.

## MEMORANDUM

DAVIS, District Judge.

Plaintiffs Eugene F. Hannon and Westowne Service Center, Inc., allege that defendant Exxon Company, U.S.A. wrongfully destroyed the value of a gasoline service station they operated. Specifically, plaintiffs allege the following claims:

1. Exxon violated the Petroleum Marketing Practices Act, ("PMPA"), 15 U.S.C. § 2801, *et seq.*, by effecting a "constructive termination" of plaintiffs' franchise;

2. Exxon violated the Maryland Gasohol and Gasoline Products Marketing Act, Md.Code Ann. Com. L. § 11–300, *et seq.*, by unreasonably withholding its consent to the assignment of the franchise;

3. Exxon intentionally interfered with Hannon's economic relations with two proposed assignees, in violation of Maryland common law;

4. Exxon negligently misrepresented its intention to convert the gas station from a repair facility into a convenience store operation, in violation of Maryland common law.

In its counterclaim, Exxon sues defendant Eugene F. Hannon for breach of contract for failing to pay two months rent on the gas station and for failing to pay for two shipments of gasoline.

Jurisdiction exists under 28 U.S.C. §§ 1331, 1332 Pending before the court is Exxon's motion for summary judgment as to all of plaintiffs' claims, as well as its counterclaim. I have thoroughly examined the parties' written submissions and counsel have been fully heard in oral argument. For the reasons discussed below, I shall grant the motion for summary judgment in all respects.

## I. FACTS

The facts shall be set forth in the light most favorable to plaintiffs. To be sure, there are several factual disputes surrounding assertions by plaintiffs that certain agents and employees of Exxon made disputed oral statements on Exxon's behalf. For the reasons to be explained below, even if those disputed statements are attributed to Exxon as plaintiffs contend they should be, as a matter of law, those statements do not have the legal effect which plaintiffs contend they should have. Accordingly, none of the disputed statements generates a genuine dispute of material fact for purposes of the pending motion.

### Background

Eugene F. Hannon, as a franchisee, was the owner of the Exxon service station ("Westowne Exxon") located at Edmondson Avenue and I–695 in Baltimore County from 1978 until he abandoned the station in October 1997. Prior to becoming the owner, Hannon had worked as a mechanic at the station. After acquiring it, Hannon ran the station with the help of his wife and two sons, James and Gene, Jr. James has been responsible for managing the day-to-day affairs of the station since the late 1980s. The station contained an automotive repair facility with three mechanic's bays. A majority of the station's profits resulted from the repair work performed there, rather

than from the sale of gasoline or other products.

The terms of the franchise agreement between Eugene F. Hannon and Exxon were embodied in two separate documents: a retail service station sales agreement and a retail service station lease agreement (referred to in combination hereinafter as "the franchise agreement"). Each agreement ran for parallel three year terms. The final pair of agreements covered the period January 1995 through January 1998. The franchise agreement provided that if Hannon wished to assign the franchise, he must provide Exxon with specified written information about the applicant's "character, financial ability and business experience."

### Exxon's Conversion Plans

At the core of the dispute between the parties lies the emergence of Exxon's "corporate vision" to convert its stations which operated auto repair facilities into more profitable "Tiger Mart" convenience stores lacking any repair facility. James testified that in 1994, Bruce Kirtin, an Exxon territory manager, orally informed him that Westowne Exxon was "on a list" of service stations to be converted to convenience stores. In fact, under Maryland law, Exxon could not convert the station from a repair facility into a convenience store operation without the franchisee's consent. See Md.Code Ann. Bus. Reg. § 10–304.

In any event, the Hannons did not want to run a convenience store, for their primary livelihood has been repairing cars. Plaintiffs allege that based on this initial 1994 communication from Kirtin, they instituted plans to purchase another facility in which to continue their car repair business, and, concomitantly, to sell the Westowne Exxon franchise. Although Eugene Hannon testified that he did not want to leave Exxon, James admitted that he had grown somewhat unhappy with Exxon's treatment of his father, with the payment of rent to Exxon, and he thought that owning their own facility would be advantageous.

Later in 1994 or early 1995, Henry Chin, another Exxon manager, told the Hannons that Westowne Exxon was not on a list of service stations to be converted. Rather, James testified, Chin told the Hannons that all stations were eventually going to be converted and that if the Hannons wanted the conversion to take place sooner, they should sign a consent form. Although the plaintiffs do not make the contention explicitly, their arguments suggest that they believe that Exxon was attempting to take advantage of their relative lack of sophistication in raising the specter of a coerced conversion, contrary to Maryland law.

In any event, the Hannons (Eugene F. Hannon was the actual franchisee but James Hannon was making all the decisions for his father) withheld consent for the conversion. Thus, according to plaintiffs, as of early 1995, they believed that the station would, at some undetermined time in the future, be converted to a convenience store. Both James and Eugene testified that they were not aware that under Maryland law the consent of a franchisee was required before a station could be converted from a repair facility into a convenience store. Apparently, they did not seek legal advice. On the other hand, they promptly sought and obtained the services of a real estate broker for assistance in identifying a suitable location for a new automotive repair facility.

### The Hannons Purchase a New Repair Facility

Allegedly prompted solely by Kirtin's initial statement that Westowne Exxon was going to be converted to a convenience store operation, the Hannons began to investigate the possibility of purchasing a property in which to operate their car repair facility. Although they required only 5,000 square feet for a new repair facility, in September 1995, they purchased a former automobile dealership containing

29,000 square feet. Although the property contained more space than they needed, the Hannons believed that the rental income generated by the additional space would ultimately service the mortgage note on the entire facility. It was thought, as well, that Eugene's retirement could be partially funded through ownership of the property.

The Hannons purchased this facility with the assistance of Matt Decker, a real estate broker, who became a partner in the deal. Decker proposed that if the Hannons would obtain the purchase money financing for the property, he (Decker) would obtain the construction loan, oversee the necessary construction work, manage the property and obtain tenants. This plan was agreed upon, and Decker obtained a 19% interest in the enterprise, with a further agreement that his stake would later increase to a 40% share.

Regrettably for the Hannons, Decker failed to perform his end of the deal. Specifically, he did not obtain the construction loan and therefore, the Hannons were obligated to assume responsibility for those costs. Moreover, Decker's failure to live up to his end of the bargain delayed the leasing process, and the rental spaces were not occupied until the end of 1996. As a further consequence of Decker's breach of the agreement, the Hannons were forced twice to refinance the property, eventually burdening the property with an $875,000 mortgage, far in excess of the Hannon's original plan. Ultimately, the Hannons were able to remove Decker from the partnership at considerable cost to them.

The Hannons had initially planned to relocate the car repair facility in early 1996; they would operate both the new facility and Westowne Exxon until the Exxon was sold. As a result of the difficulties caused by Decker, however, the Hannons did not open the new car repair facility until more than a year later than originally planned, in May or June 1997. Significantly, James admitted on deposition that had the Hannons not moved their car repair facility from Westowne Exxon they could have remained at the Exxon and run it profitably. The closure of the car repair facility at the Exxon station rendered the station unprofitable.

### The Attempted Assignment of the Westowne Franchise

In the meantime, starting in early 1995, the Hannons had been attempting to find a buyer for Westowne Exxon. Reza Zabizadeh, the owner of a nearby Amoco gas station, was the first individual to express an interest in purchasing Westowne Exxon. He made an oral offer to the Hannons of $120,000 for the franchise, but conditioned his offer on obtaining from Exxon written confirmation as to when it proposed to convert the facility to a convenience store. Exxon would not provide a written timetable, and thus Zabizadeh lost interest in the purchase. He never submitted a formal offer or completed a formal application for submission to Exxon.

The next person to express an interest in buying the franchise was Shreyas Panchigar, who already owned an Exxon franchise. Panchigar approached the Hannons in 1997 and offered them $112,500 for the franchise. James relayed Panchigar's interest to Russ Bowen of Exxon. James alleges that Bowen first told him that Panchigar would not be approved based on an alleged "point system" under which Panchigar would be penalized for already owning another Exxon franchise. When pressed as to the existence of this alleged "point system," Bowen allegedly admitted that there was no such system. Nevertheless, James alleges that Bowen revealed "off the record" that Panchigar would not be approved because he was "a thorn in Exxon's side." Bowen denies making these statements.

In any event, the Hannons decided that it would have been futile formally to submit Panchigar as an applicant for the assignment of Westowne Exxon and they ceased to pursue the deal with Panchigar.

(In December 1998, after this case had been filed, Exxon indeed approved Panchigar in connection with his purchase of another Exxon franchise).

The final person to express an interest in purchasing Westowne Exxon, and the only candidate to submit a formal dealer application package to Exxon, was Birinder Singh. Singh offered (through a broker) $70,000 for the franchise. The Hannons accepted this low offer because by then (mid 1997) their financial situation was precarious.

Exxon rejected Singh because he did not score high enough on the Exxon Dealer Selection System. The Dealer Selection System is a scoring instrument which evaluates dealer candidates based on an initial application, a reading and math test, a personality test, an initial and then a panel interview, a background and credit check and the soundness of the candidate's business plan. A successful applicant is required to obtain a minimum of 300 points (out of a total of 350 possible points).

Singh scored 262.9 points and thus Exxon rejected his application in September 1997. Charles Steele, an Exxon area manager, explained that Singh "lacked familiarity with the existing service station operation and was unable to articulate a viable strategy for future operations .... Singh was not familiar with the physical characteristics of the station" and had only visited the franchise on two occasion for a total time of less than one hour. Plaintiffs contend that Exxon's rejection of Singh was an act of bad faith violative of state law.

### The EPA Retrofit of Westowne Exxon

During Singh's evaluation, on August 25, 1997, Exxon closed the Westowne franchise for two weeks to complete certain construction that was required to bring the underground gasoline storage tanks into compliance with EPA regulations. Although the franchise agreement required Exxon to provide 30 days written notice to the Hannons of the tank retrofit, Exxon failed to do so, and merely telephoned the Hannons a week and a half prior to the commencement of the work. The Hannons, however, failed to protest the short notice and did not request a delay in the retrofit.

The work required that substantial fuel be loaded into the tanks to hold them down during the retrofit process. Exxon informed James that he would have to pay for such gasoline. James protested the requirement that the Hannons pay upon delivery of this fuel (it will be recalled that the Westowne Exxon no longer operated a repair facility and the Hannons' financial position was dire). In response, Exxon permitted the Hannons to pay for the fuel over an extended period of time. Also, in consideration of the closure of Westowne Exxon for 13 days during the construction activity, Exxon granted the Hannons a total of 26 days rent abatement.

### The Hannons Abandon the Exxon Franchise

On October 13, 1997, shortly after learning that Exxon had not approved Singh, and apparently with the advice of counsel, the Hannons abandoned Westowne Exxon. James locked the doors and drained the pumps of fuel. Exxon attempted unsuccessfully to collect the cost of the fuel delivered in October. The plaintiffs do not deny the legitimacy of Exxon's claim in this regard. Subsequent to the abandonment of the station, Exxon sent formal termination notices effective December 12, 1997. Thus, Exxon also seeks to recover unpaid rent for a two month period in consideration of the 60 day notice provision contained in the franchise agreement.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may

not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012.

## III. ANALYSIS

### A. Violation of the PMPA

The Petroleum Marketing Practices Act, ("PMPA"), 15 U.S.C. § 2801, *et seq.,* was enacted to protect franchisees "from arbitrary or discriminatory termination ·or nonrenewal of their franchises." *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 360 (4th Cir.1986)(quoting S.Rep. No. 731, 95th Cong., 2d Sess. 17, reprinted in 1978 U.S.C.C.A.N. 873, 874), *appeal after remand,* 824 F.2d 300 (4th Cir.1987)(reversing district court's denial of a preliminary injunction). Congress sought to "balance the need to protect franchisees and the need to preserve for franchisors 'adequate flexibility so that [they] may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.'" *Clark v. BP Oil Co.,* 137 F.3d 386, 391 (6th Cir.1998)(quoting *Beachler v. Amoco Oil,* 112 F.3d 902, 904 (7th Cir.1997)(in turn quoting S.Rep. No. 731, 95th Cong., 2d Sess. 17, 29 reprinted in 1978 U.S.C.C.A.N. 873, 877)).

The PMPA sets forth a comprehensive scheme that regulates the termination and nonrenewal of franchises. For example, a franchisor may only terminate a franchise if the requisite statutory notice is provided and can only terminate a franchise according to certain specified grounds.[1] A fran-

---

1. Some of the grounds sufficient to terminate a franchise are, *inter alia,* a) the failure of a franchisee to comply with a reasonable and material provision of the franchise and b) a franchisee's failure to put forth a good faith effort to carry out the provisions of the fran-

chise. *See* 15 U.S.C. § 2802(b)(2)(A)–(B). Statutory grounds for not renewing a franchise include: a) the failure of both parties to agree on changes or additions to the franchise; b) numerous customer complaints concerning the franchisee's operation; and c)

chisee has one year from "the date of termination of the franchise or nonrenewal of the franchise relationship [or from] the date the franchisor fails to comply with the requirements" of the PMPA to bring a cause of action. 15 U.S.C. § 2805(a).

■ "The general rule is that a franchisee must prove as a threshold matter that there has been a termination or nonrenewal of the franchise within the meaning of the PMPA." *Clark,* 137 F.3d at 390. *See also* 15 U.S.C. § 2805(c) ("[T]he franchisee shall have the burden of proving the termination of the franchise or nonrenewal of the franchise relationship."). Then, the franchisor bears the burden "of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted." *Id.*

In this case, the Hannons concede that they abandoned the franchise in October 1997. Thus, their PMPA claim rests entirely on their allegation that Exxon effected a "constructive termination" of the franchise by its acts and omissions which preceded the abandonment. Accordingly, plaintiffs argue that Exxon constructively terminated the franchise by (1) misrepresenting the facts surrounding the conversion of the station; (2) refusing unreasonably to permit the Hannons to assign the franchise; and (3) breaching the lease by not providing the requisite notice for the retrofit construction.[2] Plaintiffs contend that these actions, in combination, forced the Hannons to abandon the Exxon station. This argument is unavailing.

The Fourth Circuit has recognized constructive termination claims under the PMPA. In *Barnes,* a franchisee sued the franchisor claiming that the franchisor's assignment of the franchise to a third par-

ty caused fuel prices to increase above a stipulated amount. 795 F.2d at 359. The court held that this could give rise to claim of constructive termination under the PMPA. The PMPA defines a franchise as "a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold." *Id.* at 360. Therefore, the franchisor's interference with one of these statutory components—contract for supply of motor fuel—enabled Barnes to sustain her cause of action. *Id.* at 362. As to Barnes's other complaints about "detrimental changes imposed by [the third party] and the loss of Gulf's marketing services," the court found that these could not be the basis of any recovery under the Act. *See id.* at 364.

Other circuits concur in the Fourth Circuit's interpretation of a constructive termination action under the PMPA. *See e.g., May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 922 (6th Cir.1989) ("[T]o sustain a claim, under the PMPA, that a franchisor assigned and thereby constructively terminated a franchise agreement, the franchisee must prove either: (1) that by making the assignment, the franchisor breached one of the three statutory components of the franchise agreement (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premise), and thus, violated the PMPA; or (2) that the franchisor made the assignment in violation of state law."); *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 940 F.2d 744, 751 (1st Cir.1991)(finding that there was no evidence that defendant's assignment of the franchise "breached any one of the three statutory components of the

---

failure of the franchisee to operate the franchise in a safe, clean manner. *See* 15 U.S.C. § 2802(b)(3)(A)–(C).

**2.** Exxon argues that Hannon's PMPA claim, to the extent that it is based on Exxon's negligent misrepresentation regarding the conversion of the Westowne Exxon, is barred by the PMPA's one year statute of limitation, as the

misrepresentations occurred in 1994, and were completely corrected by 1996. Exxon is correct, and limitations provides an independent ground for judgment in its favor on the PMPA claim insofar as plaintiffs attempt to rely upon this ground for its constructive termination claim.

franchise agreement" and therefore, the PMPA was not implicated); *Shukla v. B P Exploration & Oil, Inc.,* 115 F.3d 849, 854 (11th Cir.1997)("PMPA termination claims must be based upon the breach of one of the three elements of the franchise agreement."); *Fresher v. Shell Oil Co.,* 846 F.2d 45, 47 (9th Cir.1988) (dismissing the plaintiffs' PMPA case because they had not alleged a "breach of any agreements which constitute components of their franchise").

■ As noted above, most constructive termination claims involve a franchisor's assignment of his interest in the franchise, which changes the terms and conditions of the franchise relationship. In these circumstances the federal courts recite uniformly that a statutory component of the franchise must be breached in order for a constructive termination claim to be successful. Even though plaintiffs' allegations are factually unique—involving not an assignment by the franchisor, but rather a refusal to permit an assignment by a franchisee—plaintiffs still must demonstrate that Exxon's actions breached one of the statutory elements of the franchise.

The cases relied on by plaintiffs in their attempts to circumvent this well-settled rule are distinguishable or without precedential value. For example, plaintiffs rely on *O'Riley v. Union Oil Co. of Calif.,* 497 U.S. 1020, 110 S.Ct. 3265, 111 L.Ed.2d 776 (1990)(remanding for reconsideration judgment of lack of jurisdiction), *opinion after remand,* 276 Cal.Rptr. 483, 226 Cal.App.3d 199 (1990), *rev. denied,* 226 Cal.App.3d 199, 276 Cal.Rptr. 483, *cert. denied,* 502 U.S. 818, 112 S.Ct. 75, 116 L.Ed.2d 48 (1991), in which the intermediate state appellate court affirmed a judgment under PMPA against Union Oil based on a jury verdict. The court refused to set aside the jury's special finding that Union Oil deliberately created the franchisee's indebtedness (by delivering unordered fuel) in order to create a pretext for the termination of the franchise. 276 Cal.Rptr. at 491. Moreover, the jury found that Union Oil did not provide the franchisee with the requisite notice of termination, which was the basis for the PMPA claim. *Id.* Although plaintiffs contend that Exxon's alleged pressure on the Hannons to convert Westowne Exxon into a convenience store facility was similar to Union Oil's pressure on its franchisee to convert to a self-serve station, that superficial similarity between the cases provides scant justification for withholding summary judgment in light of binding Fourth Circuit precedent.

Similarly, the plaintiffs' reliance on *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.1986), *cert. dismissed,* 479 U.S. 925, 107 S.Ct. 333, 93 L.Ed.2d 345 (1986), is misplaced. *Remus* involved the Wisconsin Fair Dealing Law, which provided that a franchisor cannot terminate or "substantially change the competitive circumstances of a dealership agreement without good cause." *Id.* at 1240. Even assuming *Remus* retains vitality, *see Morley–Murphy Co. v. Zenith Electronics Corp.,* 142 F.3d 373, 375 (7th Cir.1998)(noting that the rationale of *Remus* had been partially undercut by a subsequent decision of the Wisconsin Supreme Court), it did not involve a constructive termination claim, nor does the language of the Wisconsin statute mirror that of the PMPA. Thus, it does not point the way to decision in the case at bar.

■ In sum, viewing the facts in the light most favorable to plaintiffs, and applying the standard set forth in *Barnes* and the other constructive termination cases, the PMPA claim does not survive summary judgment. None of Exxon's alleged actions interfered with plaintiffs' ability to use the Exxon trademark, their continued supply of motor fuel, or their occupation of the leased premises.[3] Until

---

3. Although plaintiffs argue that Exxon breached a provision of the lease by not providing notice before the retrofit construction, the lack of advance notice did not interfere with the Hannon's lease of the premises. Not every breach of contract term gives rise to a constructive termination claim under the PMPA. *See e.g., Clark,* 137 F.3d at 391 ("The

the day that the Hannons abandoned Westowne Exxon, they enjoyed fully the three statutory franchise privileges protected by PMPA. Moreover, both James and Eugene Hannon admitted that if they had not relocated the repair facility, Westowne Exxon would have remained profitable, notwithstanding Exxon's alleged misrepresentations regarding effectuation of its "corporate vision" of convenience operations and/or its refusal to consent to the assignment of the franchise to Singh.

As a matter of law, it was the Hannons' decision to purchase the new, larger facility and to move the repair facility there before consummating a sale and transfer of Westowne Exxon that caused their dire financial circumstances. To be sure, the Hannons were in a difficult position. They had no interest in running a station with a convenience store, but they acted recklessly and precipitously out of their ignorance of the Maryland law (and the franchise agreement with Exxon, which incorporated Maryland law) requiring their consent for conversion. They became financially strapped due to Decker's incompetence. Nevertheless, these events were not caused by Exxon's actions. Therefore, summary judgment shall be granted to Exxon on the PMPA claim.

### B. Violation of the Maryland Gasohol and Gasoline Products Marketing Act

Plaintiffs next allege that Exxon unreasonably withheld its consent to their proposed assignment of the Exxon franchise in violation of the Gasohol and Gasoline Products Marketing Act, Md.Code Ann. Com. L. § 11–301, et seq. (hereinafter "the Act"). The Act regulates certain marketing agreements, including the franchise agreement between Hannon and Exxon. A "[m]arketing agreement means an oral or written agreement between a distribu-

tor and a dealer under which the dealer is granted the right, for the purpose of engaging in the retail sale of gasohol or gasoline products, supplied by the distributor, to: (1) use a trademark, trade name, service mark, or other identifying symbol of name owned by the distributor; or (2) occupy premises owned, leased, or controlled by the distributor." See Md.Code Ann. Com. L. 11–301(a)(i). Under the Act, a "distributor may not unreasonably withhold his consent to any assignment, transfer, sale or renewal of a marketing agreement...." Md.Code Ann. Com. L. § 11–304(g). Exxon does not dispute that its agreement with Eugene F. Hannon is covered by the Act.

The statute does not define "unreasonable." Analogously, however, Maryland decisional law provides that in the context of a general lease assignment, a landlord must act reasonably when giving or withholding consent. Julian v. Christopher, 320 Md. 1, 575 A.2d 735, 738 (1990). The Court listed "[t]he financial irresponsibility or instability of the transferee, or the unsuitability or incompatibility of the intended use of the property by the transferee" as examples of what could constitute a reasonable refusal. Id. at 739.

In refusing consent to an assignment, a landlord's refusal must be based on objective, rather than subjective grounds. See The Maxima Corp. v. Cystic Fibrosis Found., 81 Md.App. 602, 568 A.2d 1170, 1176 (1990), cert. denied, 319 Md. 582, 573 A.2d 1337 (1990). Thus, a landlord must "act pursuant to reasonable commercial standards, without regard to subjective attitudes personal to the landlord." Id. at 1176. See also Prestin v. Mobil Oil Corp., 741 F.2d 268, 271 (9th Cir.1984)("[a] lessor such as Mobil may refuse consent to an assignment or sublease only when the lessor has a good faith reasonable objection to it"); BASCO, Inc. v. Buth–Na–Bod-

---

PMPA does not exist to redress every breach of an agreement between a gasoline station franchisee and franchisor."); Barnes, 795 F.2d at 364 ("The broader definition [of a

franchise], however, is not intended to encompass other contractual arrangements which may exist between a franchisor and a franchisee.").

*harge, Inc.,* Civil No. 97–952 (PAM/JGL)(D.Minn. Aug. 17, 1998)(noting that "a franchisor has a duty to act reasonably when withholding consent to transfer ... [yet] acting reasonably does not equate to making a correct business decision").

Plaintiffs argue that Exxon's rejection of Singh was unreasonable and that its decision must be viewed in the context of its earlier actions taken with respect to Zabizadeh and Panchigar. In response, Exxon maintains that plaintiffs cannot bootstrap the Zabizadeh and Panchigar events onto their complaint about Singh because neither applicant was formally evaluation or considered by Exxon, and neither candidate submitted an application to Exxon— which was required pursuant to the Sales Agreement.[4] I agree that, as Zabizadeh did not even submit a written offer to plaintiffs, and the Hannons did not provide Exxon with any written information with regard to Panchigar, the events regarding those two candidates are not properly considered in evaluating the reasonableness *vel non* of Singh's rejection.[5]

■ Plaintiffs do not challenge on its face the Dealer Selection System. Thus, they do not dispute what seems self-evident as a matter of law: that Exxon's formal evaluation and scoring instrument embodies "reasonable commercial standards." *The Maxima Corp.,* 568 A.2d at 1176. Rather, they protest Exxon's rejection of Singh because: (1) his application was scored incorrectly (because it was scored on a mechanic's bay card and not a convenience store card), (2) the scoring is based, in part, on subjective criteria, and (3) Exxon fails to establish that the procedures are applied consistently. In addition, they assert that the reasons articulated for Singh's rejection were not consistent with the panel interview scores.[6]

Furthermore, in an effort to show that Singh's rejection was pretextual, plaintiffs contend without evidentiary support in the record that Exxon wanted the Hannons out of the Westowne Exxon because they were interfering with Exxon's "vision" of converting all its franchises to convenience stores. Thus, according to plaintiffs, by rejecting Singh and rendering it impossible for the Hannons to assign the franchise, the Hannons would be forced to abandon it, and therefore Exxon could "select[ ] a dealer of its own choosing, on its terms." Pl's Mem. Opp'n Summ. J. at 25.

Exxon urges the court not to second-guess its business decision that was based on its good faith application of the Dealer Selection System. It asserts that the Dealer Selection System evaluates candidates based on test scores, credit worthiness, net worth, education, and his or her business plan. Based on these articulated criteria, Singh only scored 262.9 points, less than the 300 minimum required for approval. In its reply memorandum, Exxon even recalculated Singh's score in response to plaintiffs' complaints—that is, it re-scored him based on a convenience

---

4. A rider to the sales agreement states that "Buyer shall not assign or sell any right or interest ... unless ... 60 days have passed since Buyer has (a) first received a separate written bona fide offer from a third party to purchase such right or the terms and conditions of such offer, and (b) notified Exxon in writing of the party or parties making the same, the selling price, and the terms and conditions of such offer, and (c) supplied a complete executed copy of said offer, and (d) supplied to Exxon such information relating to the character, financial ability, and business experience of the proposed transferee."

5. Even if Exxon's actions with regard to Panchigar and Zabizadeh were considered, the outcome would not change.

6. Plaintiffs also argue that because the Dealer Selection System was not in effect in 1978 when Eugene F. Hannon became a franchisee, the use of it in 1997 to evaluate Singh was improper and unreasonable. For this argument, they rely on an intermediate appellate opinion in an Arizona case, *Campbell v. Westdahl,* 148 Ariz. 432, 715 P.2d 288, 293 (1985). I am not persuaded that under Maryland law Exxon must "freeze" its dealer selection methods in the manner suggested by plaintiffs.

store score card, and adjusted the scores for net worth and education (which were on the margin). Singh still did not achieve the 300 points required.

Exxon emphasizes that Singh was unable at the panel interview to articulate a satisfactory business plan and was unfamiliar with the competition in the area. Finally, Exxon argues that its purpose in rejecting Singh could not have been to force the Hannons out and therefore choose their own dealer whose vision was consistent with Exxon's, because Singh desired to operate a convenience store, which was thus consistent with the Exxon vision, and because Westowne remained vacant for at least a year after the Hannons abandoned it, with the resultant loss of revenue.

■ Despite the normally fact-intensive quality in other contexts of a "reasonableness" analysis, in light of the undisputed circumstances surrounding Exxon's decision to reject Singh, there is no genuine issue of material fact whether Exxon acted unreasonably. That is, a reasonable jury correctly applying the law to the facts could not reasonably conclude that Exxon acted *unreasonably* in rejecting Singh.

Exxon had the contractual right to approve or reject Singh. It rejected him based on its Dealer Selection System and not out of subjective criteria "personal to [itself]." *The Maxima Corp.*, 568 A.2d at 1176. The Dealer Selection System scored and evaluated candidates based on fixed objective criteria as well as some subjective criteria. Singh's interview scores, on both the initial interview and the panel interview, ranged from poor to very good. Without any evidence from the plaintiffs (aside from their speculative argument)

that Exxon had a pretextual motive for rejecting Singh, Singh's low score on the application shields Exxon's decision from accurately being regarded as unreasonable, even if it was not wise or even "correct" in some sense favored by plaintiffs. Accordingly, summary judgment shall be granted in Exxon's favor as to the claim under the Maryland Gasohol and Gasoline Products Marketing Act.

## C. Intentional Interference with Economic Relations

■ Plaintiffs' third claim is that Exxon intentionally interfered with its economic relations with Panchigar and Singh by wrongfully causing the termination of both relationships. To avoid summary judgment as to this claim, plaintiffs must project evidence sufficient to demonstrate that Exxon committed "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; (4) and actual damage and loss resulting." *K and K Management v. Lee,* 316 Md. 137, 557 A.2d 965, 973 (1989)(citing *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663 (1984)). Although the plaintiffs claim that questions of motive and intent inherent in this test are questions for the jury, as discussed below, they fail to generate an issue of material fact as to this claim; therefore, summary judgment shall be granted in favor of Exxon.

■ As a matter of law, plaintiffs have failed to uncover any evidence to support the elements of their intentional interference claim.[7] Liability for the tort requires

7. Exxon also relies on § 769 of the Second Restatement of Torts. Section 769 states that "one who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being

prejudiced by the relation." *See also Hamro v. Shell Oil Co.,* 674 F.2d 784, 790 (9th Cir.1982)(affirming a district court's grant of summary judgment in favor of defendant Shell because in refusing to consent to Hamro's proposed assignment, it did not employ any wrongful means and as the owner of the property clearly had a financial interest in the relationship). The situation here is analogous

a showing of "tortious intent and improper or wrongful conduct." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc.*, 336 Md. 635, 650 A.2d 260, 271 (1994) (citation omitted). The only evidence in the record is that Exxon rejected Singh. Even if the application was not scored correctly, clearly this does not rise to the level of unlawful or wrongful conduct.

Furthermore, plaintiffs have not projected any evidence of Exxon's tortious intent—that is, of an intent calculated to cause damage to the plaintiffs. Plaintiffs' bare argument, that Exxon had a "corporate vision" with which the Hannons were interfering—is insufficient to generate a jury question on this claim. Exxon had a contractual right to withhold consent to an assignment, so long as they did not act unreasonably in exercising that right. *See Sharrow v. State Farm Mutual*, 306 Md. 754, 511 A.2d 492, 498 (1986)(noting that "even though a third party may for his own benefit intentionally induce one party to terminate a contract with another, this alone will not render him liable in an action for tortious interference if he had a right to cause the breach since, in such circumstances, the conduct would not be wrongful or improper").

As discussed above, plaintiffs have failed to project evidence sufficient to show that the rejection of Singh was unreasonable and therefore, his rejection cannot now be considered improper or wrongful so as to sustain plaintiffs' tort claim.

### D. Negligent Misrepresentation

The plaintiffs' final claim against Exxon is that Exxon made negligent misrepresentations regarding the conversion of the Westowne station. Thus, they argue that "in reasonable reliance upon Mr. Kirtin's and Mr. Chin's statements [one, that Wes-

towne was on a list to of stations to be converted to a convenience store and later, that although Westowne was not on any such list, their consent would make the inevitable conversion process quicker], the Hannons' made arrangements to purchase another facility for their repair business and placed Westowne up for sale." Pl.'s Mem. Opp'n Summ. J. at 30. For the purposes of the pending motion, I shall accept the plaintiffs' characterization of the communications from Exxon—that conversion was *inevitable even if Eugene F. Hannon did not consent.* Nevertheless, this claim fails as a matter of law.

■ To avoid summary judgment on their negligent misrepresentation claim, the plaintiffs must project evidence sufficient if believed to show that Exxon, "(1) owing a duty of care ..., negligently assert[ed] a false statement; (2) intend[ed] that [the] statement [would] be acted upon ...; (3) ha[d] knowledge that the plaintiff[s] [would] probably rely on the statement, which if erroneous, [would] cause loss or injury; (4) the plaintiff[s], justifiably, [took] action in reliance on the statement; and (5) the plaintiff[s] suffer[ed] damage proximately caused by [Exxon's] negligence." *Flaherty v. Weinberg*, 303 Md. 116, 492 A.2d 618, 627–28 (1985).

Exxon argues first that the negligent misrepresentation claim is barred by the three year statute of limitations because the allegedly actionable statements were made in 1994 and suit was not filed until 1998. Plaintiffs contend, however, incongruously, that (1) under the "discovery rule," a cause of action accrues at the time the plaintiff learns of the wrong and, alternatively, (2) the cause of action did not accrue until injury had been sustained, which, according to plaintiffs, did not occur until 1996 and 1997, upon Exxon's rejection of Panchigar and Singh.

to that of *Hamro*. Plaintiffs have produced no evidence that Exxon employed wrongful means in evaluating Singh and the grounds upon which Singh was rejected were related to Exxon's financial interest in the franchise. Panchigar never submitted a written applica-

tion to Exxon, therefore, the Hannons' unilateral decision to stop pursuing the deal with Panchigar, albeit based on Bowen's statement that Panchigar would be rejected, does not constitute a rejection by Exxon.

■ Insofar as the negligent misrepresentation claim is based on Exxon's 1994 statements, the claim is barred by Maryland's three year period of limitations. Plaintiffs knew more than three years before they instituted this action in June 1998 that Exxon's statements regarding its power unilaterally to effect a conversion were false. To the extent that plaintiffs contend (as they seem to contend) that no injury had been suffered within three years of Exxon's alleged statements as a result of Exxon's supposed breach of duty in making the statements, then obviously no tort was committed at all.

Manifestly, the "discovery rule" has no application whatsoever to circumstances in which a defendant's *subsequent acts* (here the withholding of consent to assignment) or omissions are the cause-in-fact and the proximate cause of injury. In this regard, plaintiffs have sought simply to recast their Maryland statutory claim based on the rejection of Singh (a claim found lacking merit above) into a common law negligence claim. Thus, plaintiffs' attempt to tie Exxon's statements in 1994 to its 1997 rejection of Singh is unavailing.

Even assuming that the statute of limitations does not bar the negligence claim, the claim fails on its merits as a matter of law. Plaintiffs contend that "the fact that Mr. Kirtin and Mr. Chin made [the misrepresentations] when Maryland law requires the consent of the dealer is evidence that Exxon intended for the Hannons to rely on the statements, and knew that they would in fact rely on the statements." Pl.'s Mem. in Opp'n Summ. J. at 30.

■ To the contrary, as a matter of law, Exxon had no duty, the breach of which is actionable under Maryland tort principles, to speak accurately regarding the import of its franchise agreement with Eugene F. Hannon. In other words, the terms of the franchise agreement and the underlying legal rules were "facts" equally available to Exxon and Eugene F. Hannon alike. They were parties to an arm's length commercial contract which obviously required legal assistance in interpretation. As a matter of law, Hannon was not justified in accepting at face value Exxon's representations as to the meaning and effect of the franchise agreement and the underlying controlling legal principles. *Layton v. AAMCO Transmissions,* 717 F.Supp. 368, 371 (D.Md.1989)("A franchisor/franchisee relationship is not fiduciary or confidential in nature, and plaintiffs therefore have stated no claim for breach of a duty arising from such a relationship.").[8]

Moreover, plaintiffs have produced no evidence that (1) Exxon intended that their statements were to be acted upon by the Hannons or that (2) Exxon had knowledge that the Hannons would probably rely on its statements to their detriment. As a matter of law, furthermore, the ostensible damages suffered by the plaintiffs in late 1997 were not proximately caused by Exxon's statements in 1994, which were undisputedly corrected by 1996. Although by that time the Hannons had purchased another facility, they admittedly did not suffer any injury until they closed the repair business at Westowne. Accordingly, sum-

---

8. *Koehler Enterprises, Inc. v. Shell Oil Co.,* Civ. No. WN 92–727 (D.Md.1993), is not to the contrary. There, a franchisee of a gasoline service station was induced to execute a second franchise agreement on the basis of a series of false representations as to the franchisor's then present intention regarding the type of service station that would be constructed. The franchisee even declined, at one point, to execute the agreement on the basis of perceived discrepancies between the parties' oral negotiations and the written agreement as proposed, but he was dissuaded from withdrawing from the deal on the franchisor's oral interpretation of the written agreement at closing. The court denied summary judgment as to both intentional and negligent misrepresentation claims asserted under Maryland law. The facts in the case at bar, involving, *inter alia,* an alleged misrepresentation of Maryland *law* not a misrepresentation of fact, distinguishes *Koehler,* in which the court found inapplicable on its facts the rule of *Layton* cited in text. I apply *Layton* in this case.

mary judgment shall be granted in Exxon's favor as to the negligence claim.

### E. Exxon's Counterclaim

Exxon's counterclaim seeks damages for the rent and motor fuel costs owed to Exxon. As to the money for the gasoline, the plaintiffs acknowledge that they are indebted to Exxon. Exxon has submitted invoices in the amount of $21,892.57, which are undisputed. Thus, summary judgment shall be granted in favor of Exxon as to the gasoline debt.

Exxon also seeks two months unpaid rent. Exxon asserts that assuming the Hannons' October 17, 1997, letter to Exxon properly terminated its lease, then the franchisee would be liable for 60 days rent, i.e., for failing to comply with the 60 days notice requirement in the franchise agreement. This amount is $12,750.83.

Hannon seeks to avoid liability for the rent in two ways: (1) because Exxon's actions amounted to a constructive eviction and (2) estoppel. I have already rejected the first ground as a matter of law in connection with the constructive termination claim under PMPA. *See also Stevan v. Brown*, 54 Md.App. 235, 458 A.2d 466, 470 (1983).

 In support of the estoppel contention, James Hannon avers that "I asked Mr. Bowen if we would be liable to Exxon if we closed the station, and Mr. Bowen responded, 'absolutely not.' " Exxon responds that even if true (which it disputes), Hannon and Exxon signed a written integrated contract that required 60 days notice before termination. I agree that Bowen's statement "absolutely not" does not constitute a binding oral modification by the conduct of the parties or mutual assent, as required by Maryland law to modify the contract. Therefore, the Hannons remain liable for the franchise rent.[9]

9. In the exercise of discretion, prejudgment

### IV. CONCLUSION

For the reasons stated above, judgment shall be entered in favor of Exxon. An order follows.

### ORDER

For the reasons stated in the accompanying memorandum, it is this 10th day of May, 1999, by the United States District Court for the District of Maryland, ORDERED

(1) That the defendant's motion for summary judgment is GRANTED and JUDGMENT IS ENTERED IN FAVOR OF DEFENDANT in the amount of Thirty–Four Thousand Six Hundred Forty–Three and ⁴⁰⁄₁₀₀ ($34,643.40) Dollars; and it is further ORDERED

(2) That Clerk of the Court CLOSE THIS CASE and TRANSMIT a copy of this Order and the foregoing Memorandum to counsel of record.

interest is disallowed as to Exxon's claim.