**MIKERON, INC.**

v.

**EXXON COMPANY, U.S.A.**

**No. CIV.A.DKC 98–1070.**

United States District Court,
D. Maryland.

Feb. 21, 2003.

Karen Lynn Gilbert, Robert J. Kim, McNamee Hosea Jernigan Kim Greenan and Walker PA, Greenbelt, MD, Allen J. Kruger, Law Offices of Allen J. Kruger, PA, Christopher B. Mead, London and Mead, Washington, DC, Harry C. Storm, Abrams West Storm and Siamond, PC, Bethesda, MD, for Mikeron, Inc., (Plaintiff).

Stuart H Harris, Roger A. Klein, Howrey Simon Arnold and White LLP, Washington, DC, Gregory T. Kenney, Law Office, Houston, TX, for Exxon Company USA, (Defendant).

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this case is the motion for summary judgment of Defendant Exxon Mobil Corporation (sued as "Exxon Company, U.S.A." and referred to herein as "ExxonMobil" or "Defendant"). The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For the reasons that follow, the court will grant the motion for summary judgment in its entirety.

## I. Background

The following facts are uncontroverted or set forth in the light most favorable to Plaintiff. On or about September 25, 1996, Plaintiff Mikeron, Inc. ("Mikeron" or "Plaintiff") and Defendant entered into a Retail Motor Fuel Store Lease ("Lease") and a Retail Motor Fuel Store Sales Agreement ("Sales Agreement"). Under these agreements, Plaintiff leased from Defendant and operated two Exxon service stations, one in Fort Washington, Maryland and the other in Woodbridge, Virginia, and purchased Exxon-branded motor fuel to be resold at those service stations. The two agreements constituted a franchise pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806, which governs the relationship between suppliers and re-sellers of branded petroleum products. The Lease and Sales Agreement covered the period from October 1, 1996 through October 1, 1999.

In the fall of 1997, Plaintiff proposed to Defendant the idea that Plaintiff would transfer its interests in the two service stations to two separate individuals. Plaintiff retained the services of Corporate Investments, a commercial brokerage firm that engages in the sale of service stations, to screen and approve two potential purchasers. Plaintiff then proposed as transferees Hamid Aziz ("Aziz") for the Woodbridge station and Shamsher Singh ("Singh") for the Fort Washington station. However, Defendant refused to consent to the transfer of Plaintiff's interests in either service station to the proposed transferees even though, Plaintiff alleges, both were qualified to operate the businesses. Defendant contends that it rejected Aziz and Singh pursuant to the ExxonMobil Dealer Selection Guidelines ("Guidelines") because Aziz failed a credit review and Singh did

not score enough points under the Guideline's six screens.[1]

In addition, Plaintiff alleges that Defendant charged other, independently-owned Exxon stations within close proximity to those operated by Plaintiff a substantially lower price-per-gallon of gasoline and other goods. Plaintiff further alleges that Defendant gave other stations greater voluntary concessions, such as rent adjustments and rebates, than it gave to Plaintiff. On April 8, 1998, Plaintiff filed suit charging Defendant with improperly withholding consent to the transfer of the service stations. Plaintiff amended the complaint on October 28, 1998, and then again on November 10, 1998, adding counts pertaining to the allegations of price discrimination against Defendant.

On January 18, 1999, Plaintiff sent a letter requesting an accounting from Defendant and disputing charges for the sale and delivery of certain Exxon products to Plaintiff. The letter also notified Defendant of Plaintiff's intention to sell non-Exxon branded fuel and to begin the de-branding and de-identification process as specified in the Sales Agreement. Approximately one week later, on January 25, 1999, Defendant terminated Plaintiff's Lease, Sales Agreement and franchise. The termination letter stated that the grounds for the termination were that Plaintiff (a) breached its Lease with Defendant by using Defendant's motor fuel storage tanks and dispensing equipment for the storage, dispensing and sale of non-Exxon-branded motor fuel and (b) breached its Sales Agreement with Defendant by

failing to provide a representative offering of Exxon-branded motor fuel at the two service stations it leased and operated. *See* Paper no. 79, App. A, Tab 2, Ex. N.

On January 27, 1999, Defendant filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin Plaintiff from using the Exxon trademark and to prevent Plaintiff from using Defendant's storage tanks, lines, dispensers and other equipment in connection with the dispensing and/or sale of non-Exxon motor fuel. The court granted the temporary restraining order by consent as to the trademark issue, but denied the remainder. Plaintiff then filed a motion to preliminarily enjoin Defendant's termination of the franchise pending litigation. At a hearing on February 19, 1999, the court denied that motion and ordered Plaintiff to vacate both service stations. On February 24, 1999, Plaintiff filed a Third Amended Complaint adding a count for violation of the PMPA to its existing counts. Defendant now moves for summary judgment on all counts.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that

---

1. The Guidelines contain six tests or "screens" by which Defendant evaluates dealer applicants. The six screens include: (a) the written application (50 points); (2) a math and reading comprehension test (50 points); (3) a Hogan Personal Inventory (50 points); (4) an initial interview (50 points); (5) a credit review (50 points); and (6) a panel interview (100 points). If an applicant receives a score of at least 300 points, the applicant is approved unless he has failed the credit review. *See* Paper no. 79, App. A, Tab 2, Ex. B. Singh scored only 259.8 points and had the most difficulty in the initial and panel interviews, where he allegedly failed to demonstrate sufficient business acumen.

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex Corp.*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."

Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C.1966), aff'd, 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### III. Analysis

#### A. Disapproval of Assignment Claims

##### 1. Breach of Contract Claim (Count I)

█ Plaintiff claims that Defendant breached the Franchise Agreement with Plaintiff, including its obligation of good faith and fair dealing, by arbitrarily and unreasonably refusing to approve Plaintiff's prospective transferees. However, both the Lease Agreement and Sales Agreement (which together constitute the Franchise Agreement) contain provisions explicitly *prohibiting* Plaintiff from transferring or assigning its franchises to a third party. *See* Paper no. 79, App. A, Tab 2, Ex. A. The Assignability Rider to the Lease provides that "TENANT shall make no assignment of this Lease ... in whole or in part, directly or indirectly."

*Id.* The Assignability Rider to the Sales Agreement provides that "DEALER shall make no assignment of this Sales Agreement ... in whole or in part, directly or indirectly." *Id.* Thus, Defendant's refusal to approve the transfer of the two stations, whether reasonable or not, does not violate any contractual provision, and Defendant is entitled to summary judgment.[2] *See, e.g., Bill Call Ford v. Ford Motor Co.,* 830 F.Supp. 1053, 1056–57 (N.D.Ohio 1993) (finding that where contract prohibited assignment or transfer of franchise, franchisee's claim that franchisor unreasonably withheld consent to transfer was "without contractual predicate").

■ Plaintiff cannot rescue this claim by relying on the covenant of good faith and fair dealing. That obligation merely obligates the parties to exercise good faith in performing their contractual obligations; it cannot be invoked to require a party to take an action contrary to the express terms of a contract. *See, e.g., Parker v. Columbia Bank, et al.,* 91 Md.App. 346, 366, 604 A.2d 521, 531 (1992). Because the Franchise Agreement expressly prohibits transfer or assignment of the franchise, Plaintiff cannot use the obligation of good faith and fair dealing to penalize Defendant for disapproving the proposed transfers.

### 2. Maryland Gasohol and Gasoline Products Marketing Act Claim (Count II)

■ Plaintiff next alleges that Defendant violated MD. CODE ANN., COM. LAW II § 11–304 (part of the Gasohol and Gasoline Products Marketing Act), which states that a gasoline supplier "may not unreasonably withhold his consent to any assignment, transfer, sale, or renewal" of a service station business. *Id.* § 11–304(g). Defendant argues that this claim must fail because its decisions to disapprove Plaintiff's proposed transferees, Aziz and Singh, were made in accordance with its Dealer Selection Guidelines. The statute does not define the term "unreasonable." However, in a recent decision relying on the decisional law on the general assignment of leases, this court determined that a franchisor's disapproval must be based on "reasonable commercial standards." *See Hannon v. Exxon Co., U.S.A.,* 54 F.Supp.2d 485, 494 (D.Md.1999). Then, the court turned specifically to Defendant's Guidelines and ruled that they "embod[ ]y 'reasonable commercial standards,' " and that a defendant's adherence to them in disapproving an applicant "shields [that] decision from accurately being regarded as unreasonable, even if it was not wise or even 'correct' in some sense." *Id.* at 495 (quoting *The Maxima Corp. v. Cystic Fibrosis Found.,* 81 Md.App. 602, 568 A.2d 1170, 1176 (1990)). In the instant case, neither applicant scored the requisite number of points under the Guidelines' scoring system.

■ Even independent of the Guidelines and the court's decision in *Hannon,* Defendant arguably acted in a reasonable manner in rejecting Aziz and Singh. With regard to Aziz, who failed the credit review, it is not unreasonable for a franchisor to disapprove the sale of one of its franchises to a financially unstable transferee. *See, e.g., In re Pioneer Ford Sales, Inc.,* 729 F.2d 27, 31 (1st Cir.1984); *Si-*

---

2. The Assignability Riders also provide that if a "valid state statute specifically applicable to the transfer of branded motor fuel contracts or retail motor fuel store leases requires Exxon[Mobil] to consider giving consent" to a proposed assignment, then the franchisee must give ExxonMobil a right of first refusal with regard to any proposed assignment. *See* Paper no. 79, App. A, Tab 2, Ex. A. These riders, however, do not establish a contractual right for Plaintiff to assign its franchises.

*monds Chevrolet, Inc. v. General Motors Corp.,* 564 F.Supp. 151, 153 (D.Mass.1983). Similarly, it is not unreasonable for a franchisor to reject a transferee, such as Singh, who it deems to lack the requisite business experience or acumen. *See, e.g., Simonds Chevrolet,* 564 F.Supp. at 153.

■■■ Plaintiff does not come forward with any substantial evidence that Defendant acted unreasonably in disapproving the assignments to Aziz and Singh. Plaintiff does not challenge the Guidelines on their face, nor does Plaintiff provide any evidence that Defendant applied the Guidelines incorrectly in evaluating Aziz and Singh as transferees. Plaintiff also does not challenge the applicability of the *Hannon* ruling to this case. In defense of its claim, Plaintiff merely offers the deposition testimony of Arnold Heckman ("Heckman") of Corporate Investments.[3] *See* Heckman Dep. at 168 (Paper no. 79, App. A, Tab 7). However, Heckman's testimony that the rejections of Aziz and Singh were unreasonable is only a subjective, unsubstantiated opinion, which is insufficient to raise a genuine issue of material fact. Heckman did not contend that the Guidelines were unreasonable, had no evidence that Defendant misapplied the Guidelines in the case of Aziz or Singh, and, in fact, had never seen the Guidelines before. *See id.* at 126, 131–32, 144–47. Further, Heckman appears to have formed his opinion without knowing about Aziz's financial woes, or how Singh had performed in his interviews. *See id.* at 337–38, 199–200, 203. He failed to provide any basis for his conclusory statement that Defendant acted unreasonably. If an "expert" witness is relying solely or primarily on experience, as Heckman appears to be, he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See* FED.R.EVID. 702 advisory committee's note. Because Heckman provided no basis for his opinion, his deposition is not reliable evidence and does nothing to cast into doubt the "reasonableness" of Defendant's decision to disapprove the proposed transferees. " '[A] mere scintilla of evidence is not enough to create a fact issue.' " *Barwick,* 736 F.2d at 958–59 (internal citation omitted). Therefore, there is no genuine dispute of material fact here that Defendant's disapproval of the proposed transferees was reasonable. Accordingly, summary judgment shall be granted in Defendant's favor as to the Maryland Gasohol and Gasoline Products Marketing Act claim.

## B. Pricing Claims

### 1. Robinson–Patman Act Claim (Count III)

■■■ Plaintiff argues that Defendant violated the Robinson–Patman Act, 15 U.S.C. § 13, by acting in a discriminatory manner toward Plaintiff with respect to the prices

**3.** Plaintiff also makes an unsubstantiated assertion that Defendant purposefully withheld the transfer of the service stations as part of a personal vendetta against Mangum, without any consideration of the qualifications of the proposed transferees. Plaintiff offers no evidence, other than Mangum's own deposition, to support this theory. The assertion in his deposition that Defendant's representative John Greco told Corporate Investment's broker Bryan Smyth who then told Mangum that Defendant was "not going to approve any purchaser" is multiple hearsay. Hearsay evidence does not provide sufficient support to defeat a summary judgment motion. *See Evans v. Tech. Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir.1996). Moreover, it makes no sense that if Defendant had a vendetta against Mangum that it would withhold consent to transfer his franchises; if Defendant truly did not like Mangum, it would make more sense to approve the transfer and no longer have to do business with him.

of gasoline and "other goods," rents charged to lessee-dealers, and voluntary concessions. Plaintiff alleges that Defendant discriminated against it in this manner with the intent to substantially lessen competition or to create a monopoly. In order to establish a violation of the Robinson–Patman Act, Plaintiff must prove: (1) sales of commodities in interstate commerce; (2) that the gasoline and other goods sold to Plaintiff were of the same grade and quality as those sold to other similarly situated dealers; (3) that Defendant discriminated in price between Plaintiff and other dealers; and (4) that the discrimination had a prohibited effect on competition. *See Texaco, Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *Berlyn, Inc. v. The Gazette Newspapers, Inc.,* 157 F.Supp.2d 609, 621 (D.Md.2001). The first two elements are not subjects of dispute in the instant case, but Defendant contends that the third and fourth elements have not been met. The court agrees.

▬ Plaintiff has failed to provide sufficient evidence to establish that Defendant engaged in discriminatory pricing between Plaintiff and similarly situated dealers. Plaintiff's answers to Defendant's interrogatories about the pricing claims were vague and provided no concrete information. The record is devoid of any details of allegedly discriminatory price transactions, such as dates of sale, identities of purchasers, or actual prices charged. The only evidence of discriminatory pricing offered is the deposition of Plaintiff's president Mangum, which contains general assertions that some other ExxonMobil dealers were charged lower wholesale gasoline prices than Plaintiff. *See* Paper no. 79, App. A, Tab 1. Although Mangum claimed to have seen other ExxonMobil dealers' invoices showing lower gas prices, he neither provided any copies of them nor any specific information regarding allegedly discriminatory transactions.[4] Plaintiff has similarly failed to provide any evidence regarding discrimination in "other goods" and "voluntary concessions."

Plaintiff has also failed to establish any injury to competition. Possible injury to competition "so obviously follows from [differential pricing] that it 'is established prima facie by proof of a substantial price discrimination between competing purchasers over time.'" *Hoover Color Corp. v. Bayer Corp.,* 199 F.3d 160, 163 (4th

---

4. Plaintiff concedes in its opposition that it has "little physical documentation to support" these claims, but suggests that its lack of evidence is due to Defendant's obstruction of the discovery process. *See* Paper no. 82 at 4, 8. Specifically, Plaintiff claims that Defendant refused to schedule the depositions of Exxon executives John Allred and Jim Carter, and inhibited Plaintiff's efforts to obtain documents from competitor Exxon stations. *See id.*

Plaintiff's complaints about discovery at this time are inappropriate and insufficient. Plaintiff had more than enough time to conduct discovery on its claims; in fact, excluding the time the case was stayed due to Plaintiff's bankruptcy, Plaintiff had close to two years to take discovery. Moreover, during the years this case has been pending, Plaintiff never filed a motion to compel discovery. Plaintiff never moved to compel the depositions of Carter or Allred or responses to interrogatories or document requests. Plaintiff may not do so for the first time at summary judgment.

Finally, even if it were appropriate at this stage to express discovery-related complaints, Plaintiff has not complied with FED.R.CIV.P. 56(f), which requires that a party alleging inadequate discovery must file an affidavit setting forth the specific discovery that needs to be taken and the reasons for the needed discovery. *See Nguyen v. CNA Corp.,* 44 F.3d 234, 242 (4th Cir.1995). Plaintiff neither filed an affidavit nor described with specificity the materials he seeks to uncover. For all of these reasons, Plaintiff's complaints about discovery are irrelevant.

Cir.1999) (quoting *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 435, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983)). Plaintiff has not offered any such proof. Because Plaintiff has not established the elements necessary for a violation of the Robinson–Patman Act, Defendant is entitled to summary judgment on this count.

*2. Maryland Antitrust Act Claim (Count IV)*

Plaintiff makes the same arguments about discriminatory pricing under MD. CODE ANN., COM. LAW II § 11–204, which is nearly identical to the Robinson–Patman Act. The Maryland legislature has stated that the purpose of the Maryland Antitrust Act is to "complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices" and has directed that courts construing Maryland's state antitrust law should be "guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." MD. CODE ANN., COM. LAW II § 11–202(a)(2). This court has specifically noted that it is appropriate to look to Robinson–Patman Act decisions in construing Section 11–204. *See Soth v. The Baltimore Sun Co.,* 4 F.Supp.2d 417, 420 (D.Md.1996) ("Federal antitrust law is used to interpret . . . [Section 11–204], which mirror[s] . . . section 13(a) of the Robinson–Patman Act . . .").

Therefore, just as Plaintiff's Robinson–Patman Act claim failed because Plaintiff did not establish two of the essential elements, it also fails under Section 11–204 for the same reasons. "[S]tate claims under section 11–204(a) and (b) must fail where those same claims would also fail under similar federal law." *Hinkleman v. Shell Oil Co.,* 962 F.2d 372, 379 (4th Cir. 1992); *Neugebauer v. The A.S. Abell Co.,* 474 F.Supp. 1053, 1071 (D.Md.1979) (granting summary judgment on Section 11–204 claim because summary judgment was granted on similar Robinson–Patman Act claim). *See also Baltimore Scrap Corp. v. The David J. Joseph Co.,* 81 F.Supp.2d 602, 620 (D.Md.2000) (granting summary judgment on state law antitrust claim because claim under similar federal antitrust law failed on summary judgment). Because Plaintiff's state antitrust claim is based on the same factual record as the Robinson–Patman claim for which the court has already granted summary judgment, Defendant is also entitled to summary judgment on the state law claim.

*3. Good Faith Pricing Claim (Count V)*

Plaintiff argues that Defendant violated MD. CODE ANN., COM. LAW II § 2–305, which requires that the price of the gasoline and other goods sold by Defendant to Plaintiff be established in good faith and in accordance with reasonable commercial standards. *See id.* cmt. 3. Plaintiff contends that by acting in a discriminatory manner toward Plaintiff with respect to the price of gasoline and other goods, Defendant has not acted in good faith and in accordance with such standards. However, as discussed in the subsections above, Plaintiff has not provided any substantial evidence that Defendant charged higher prices to Plaintiff than to Plaintiff's competitors for gasoline or any other product, or that Defendant set any of its prices in bad faith. Because Plaintiff has forecast no evidence whatsoever to support its Section 2–305 claim, Defendant is entitled to summary judgment.

**C. PMPA Claim—Wrongful Termination of Franchise *(Count VI)***

▉ Plaintiff has claimed that Defendant violated the PMPA when it terminated the franchise agreement between the parties on January 25, 1999. Under the PMPA, a franchisor may terminate or refuse to renew a franchise only if one of the

grounds set forth in § 2802(b) exists. *See* 15 U.S.C. § 2802(a). Defendant asserts that it was justified in terminating the franchise with Plaintiff based on the exceptions in § 2802(b)(2)(A) and 2802(b)(2)(C). Section 2802(b)(2)(A) authorizes termination where there has been a "failure by the franchisee to comply with a provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." *Id.* § 2802(b)(2)(A). Section 2808(b)(2)(C) allows termination upon "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable . . . ." *Id.* § 2808(b)(2)(C).

Defendant's justification for the termination is that Plaintiff failed to comply with at least two provisions of the franchise agreement: (1) the specification in Article 3(L) of the Lease that Plaintiff could use Defendant's equipment "only for the storage, dispensing, and sale of EXXON-branded gasolines and diesel fuels purchased directly from EXXON"; and (2) Section 10.1(F) of the Sales Agreement, which required Plaintiff to promote, preserve and increase the public's confidence in Exxon-branded products, to maintain and enhance the sale of such products, and to sell a "representative offering" of Exxon-branded fuels, defined as at least two Exxon-branded fuels. *See* Paper no. 79, App. A, Tab 2, Ex. A.

Defendant has provided considerable evidence that Plaintiff breached both of these provisions. Plaintiff's own president, Mangum, testified in his deposition that Mikeron sold unbranded gasoline at the two service stations using Defendant's tanks, lines, and dispensers. *See id.,* Tab 1. Mangum also admitted having sold non-Exxon branded gasoline at both stations in an affidavit filed with this court. *See id.,* Tab

5. Defendant has also provided receipts generated by the fuel dispensers at both stations stating that the fuel dispensed was not Exxon fuel. *See id.,* Tab 2, Ex. M. In addition, Mangum admitted in his deposition that Mikeron ceased purchasing fuel from Defendant for either station in late 1998 and that during that period, Mikeron sold only non-Exxon branded fuels. *See id.,* Tab 1.

Defendant argues that Plaintiff's demonstrated breaches of Article 3(L) of the Lease and Section 10.1(F) of the Sales Agreement constitute proper grounds for termination of the franchise under 2802(b)(2)(A) and (C) of the PMPA. With respect to the requirement in Article 3(L) of the Lease that Plaintiff use Defendant's tanks, lines and pumps only to store and dispense Exxon-branded gasoline, it is well-settled that such a provision is an acceptable means of protecting a franchisor's goodwill and ensuring safe distribution of a hazardous product. *See, e.g., FTC v. Sinclair Refining Co.,* 261 U.S. 463, 474–75, 43 S.Ct. 450, 67 L.Ed. 746 (1923). In *Pugh v. Mobil Oil Corp.,* 533 F.Supp. 169, 175 (S.D.Tex.1982), a case very similar to this one, the court held that the franchisor's "need to protect goodwill and reputation" justified a contract provision requiring the franchisee to use pumps and other service station equipment solely for the franchisor's products. The law is also well-settled regarding provisions like Section 10.1(F) of the Sales Agreement, which requires Plaintiff to offer a representative sampling of Defendant's branded motor fuels. Courts have repeatedly held that contract provisions requiring a gas station franchisee to purchase and sell a minimum amount of the franchisor's products are reasonable and significant to the franchise agreement. *See, e.g., Shell Oil Co. v. A.Z. Services, Inc.,* 990 F.Supp. 1406, 1413–14 (S.D.Fla.1997); *Smoot v. Mobil Oil Corp.,* 722 F.Supp. 849, 855

(D.Mass.1989) (finding that a provision of the franchise agreement requiring the franchisee to sell the franchisor's fuel was fundamental to the franchise relationship); *Mobil Oil Corp. v. Shah*, 671 F.Supp. 503, 506 (N.D.Ill.1987).

Thus, the court agrees that both contract provisions breached by Plaintiff are reasonable and of material significance to the franchise relationship, and their breach is sufficient grounds for termination of the franchise, pursuant to § 2802(b)(2)(A).[5] Accordingly, because Defendant's termination of the franchise was justified, Defendant has not violated the PMPA and is entitled to summary judgment on this count.[6]

## IV. Conclusion

For the foregoing reasons, Defendant ExxonMobil's motion for summary judgment will be granted. A separate Order will be entered.

---

5. Because the court finds that Defendant's termination of the franchise was justified under § 2802(b)(2)(A), it is unnecessary to consider whether the termination was also justified under § 2802(b)(2)(C).

6. To the extent that Plaintiff has argued for the first time in its reply that Defendant somehow forced it to breach the Franchise Agreement by charging Plaintiff discriminatory prices and unreasonably disapproving assignment to Aziz and Singh, that argument is without merit. As discussed earlier in this opinion, Plaintiff has not provided evidence that Defendant charged discriminatory prices or that Defendant's disapproval was unreasonable. Moreover, the lengthy record in this case indicates that Mangum made the decision on his own for Plaintiff to breach the Franchise Agreement. *See, e.g.,* Mangum Dep. at 217–18, 220–22 (Paper no. 79, App. A, Tab 1).